**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| **ANGELO LAMONT JACKSON,** | * |
| **Plaintiff,** | * |
| **v.** | *   **Case No.: 8:19-cv-00564-PWG** |
| **MICHAEL CARIN,** | * |
| **Defendant.** | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Angelo Lamont Jackson filed this lawsuit against Detective Michael Carin of the Montgomery County Police Department ("MCPD"), claiming violations of the Fourth Amendment to the U.S. Constitution, 42 U.S.C. § 1983, Articles 24 and 26 of the Maryland Declaration of Rights, and asserting a Maryland state law claim for gross negligence in connection with Detective Carin's application for a warrant for Mr. Jackson's arrest, which Mr. Jackson alleges was not supported by probable cause. Pending before me are the Parties' Cross-Motions for Summary Judgment, which are fully briefed.[1] No hearing is necessary to resolve the pending Motions. Local Rule 106.5 (D. Md. 2021). For the reasons explained below, Mr. Jackson's Motion for Summary Judgment is DENIED and Detective Carin's Motion for Summary Judgment is GRANTED.

### FACTS AND PROCEDURAL BACKGROUND

---

[1]     ECF No. 37, Defendant's Motion for Summary Judgment ("Def. MSJ"); ECF No. 34, Plaintiff's Cross-Motion for Partial Summary Judgment and Opposition to Def. MSJ ("Pl. MSJ/Opp."); ECF No. 39, Defendant's Reply and Opposition to Pl. MSJ ("Def. Reply/Opp."); ECF No. 40, Plaintiff's Reply in Support of Cross-Motion for Summary Judgment ("Pl. Reply").

On January 10, 2017, two individuals were stabbed to death at the Westfield Shopping Center in Wheaton, Maryland. Detective Carin responded to the scene of the double-homicide along with several other members of the MCPD. While at the mall, Detective Carin spoke to at least one eyewitness and viewed the mall's video surveillance footage, which had captured most of the crime, including an image of the suspected perpetrator. Detective Carin took a photo of the suspect as shown on the surveillance video to aid in his investigation.

MCPD Detective Brendon Johnston also responded to the scene and was shown "an image of the suspect on the mall video recording." ECF No. 37-7 (Affidavit of Detective Johnston). Detective Johnston took a picture of that image, and texted it to his colleagues in the Criminal Street Gang Unit to see if they might be of any assistance in identifying the suspect. *Id.* Detective Johnston's notes from the day of the stabbing indicate that a detective with the Criminal Street Gang Unit, Detective Juan Lozano, "immediately knew the suspect as Angelo Jackson," who was known to the Criminal Street Gang Unit "as an associate of [a gang called] Hittsquad." *Id.* Detective Lozano sent Detective Carin an email the following day confirming that he recognized "the suspect as being Angelo Jackson a previously validated gang member of the Hittsquad Gang." ECF No. 37-9 (Jan. 11, 2017, Email from Det. Lozano to Det. Carin). On Detective Carin's request, Detective Lozano wrote a "more detailed statement" on January 12, 2017, which noted that the picture Detective Johnston sent to him "was of a light skinned male wearing what appeared to be a black coat and a purple sweater underneath" and that "the subject resembled a male that is known to associate with the Hittsquad gang, Angelo Jackson." ECF 38-2 (Lozano Statement). Detective Lozano explained:

> Hittsquad is a gang that we have dealt with on a frequent basis since the time I have been with the Gang Unit. Angelo Jackson is a validated member of the gang and I see his photograph any time that we use the Hittsquad Gang flyer for reference or when we update the flyer. A local rapper, Simba, who is also part of Hittsquad

frequently post rap videos on to Youtube. I view these videos in order to see if I can identify any members of the gang in them. Angelo Jackson is in at least one of these Youtube videos. In August of 2016, during the Montgomery County Agricultural fair, I observed Angelo Jackson in person walking around the fair. I recognized Angelo Jackson from the pictures we have used of him on the Hittsquad flyer and his involvement in Simba's rap video.

*Id.*

Detective Carin testified that when he was departing the mall on January 10, 2017, MCPD Detective Drew approached his car and informed him that the suspect had been identified as Angelo Jackson. ECF No. 37-3 (Carin Dep. at 33:19–34:3). More specifically, Detective Carin "was told that the corporal from the gang unit whose name was Brendan Johnston sent it out to the gang officers, and there was a detective participating in another homicide that was out of state at the time, and he indicated that the suspect was Angelo Jackson." *Id.* at 34:10–17. Detective Carin then clarified that the detective who identified Mr. Jackson was Detective Lozano. *Id.*

Years later, when he was deposed in connection with this case, Detective Lozano acknowledged that he had misidentified Mr. Jackson as the individual in the surveillance video in January 2017. ECF No. 37-8 (Lozano Dep. at 21:1–20). Detective Lozano testified that, at the time he made his mistaken identification, he had seen Mr. Jackson in person only once, when the two men were, by happenstance, at a county fair at the same time. *Id.* 9:18–10:2. He recognized Mr. Jackson on that occasion because he had been "identified as a member of the Hit Squad gang, a neighborhood gang in Gaithersburg," and Detective Lozano had seen Mr. Jackson on fliers, on social media, and featured in the background of rap videos made by a local musician. *Id.* at 10:4–11; 14:15–21. Detective Lozano testified repeatedly that, although he was incorrect, he believed at the time of his initial identification that the individual shown on the surveillance video was Mr. Jackson. *Id.* at 27:5–29:7.

Detective Carin departed the Wheaton Mall after learning of Detective Lozano's identification. ECF No. 37-6 (Carin Answers to Int.) at 4. Upon his return to his office, Detective Carin "was informed that Angelo Jackson had previously been arrested by School Resource Officer George Hyson." *Id.* Detective Carin "sent Officer Hyson a still picture of the suspect from the surveillance video" to see if Officer Hyson recognized him. *Id.* Detective Carin testified that Officer Hyson "identified the person in the photo as Angelo Jackson." Carin Dep. at 39:4–5. When pressed for specifics, Detective Carin explained that Officer Hyson first texted him stating that the suspect in the still picture looked familiar, and later texted Detective Carin pictures that he understood to confirm the identification. *Id.* at 41:2–42:15. Detective Carin also testified that he spoke to Officer Hyson on the phone the same evening and that Officer Hyson identified Mr. Jackson as the individual in the picture and "remembered him from [an] incident that occurred at the high school" where he worked. *Id.* at 41:19–42:13.

The text exchange between Detective Carin and Officer Hyson partially confirms Detective Carin's testimony. *See* ECF No. 37-11 (Carin-Hyson Text Exchange). On a Tuesday at 8:58 PM, Detective Hyson received a still picture of the suspect as shown on the surveillance video (January 10, 2017 was a Tuesday). *Id.* Detective Hyson responded to the message stating: "Looks familiar, not sure at the moment. Face is familiar to me." Detective Carin then texted: "Ok if you can check your yearbooks and get back to me. Thank you in advance," to which Officer Hyson responded: "Most definitely will do." *Id.* The next messages in the exchange are four pictures, apparently sent by Officer Hyson, which show a Maryland driver's license for Charlene Young, a Clarksburg High School student ID card for Angelo Jackson, and two photos of a young black man in a t-shirt and jeans standing against a white wall. *Id.*

4

During his deposition, Officer Hyson recalled that he was contacted by text message by "someone from homicide" while he was on duty at a high school basketball game. ECF No. 37-10 (Hyson Dep.) at 26:15–27:8. The messages Officer Hyson received contained a still picture of a young black man wearing a jacket and a hood. *Id.*[2] Officer Hyson replied to the text message stating that the individual looked familiar to him but that he was "not sure." *Id.* at 32:22–33:9. Officer Hyson testified that, although he said he would do so, he did not ultimately check any yearbooks to determine the suspect's identity. *Id.* 36:7–17. Officer Hyson identified the four pictures at the end of the text exchange as "the pictures that [he] had in [his] case file from when [he] arrested Mr. Jackson" in a prior unrelated incident. *Id.* at 29:10–19. Officer Hyson did not remember if he had sent the pictures in the text exchange or if they had been sent to him, but recalled that they were pictures that he had taken himself in connection with the prior arrest. *Id.* at 39:1–5.[3]

Officer Hyson also recalled that he spoke to someone—he could not recall whether it was Detective Carin—on the phone the same evening of the text exchange, and that he thought the phone call was after he had responded to the initial text message, though he was not certain. *Id.* at 37:3–6. Officer Hyson described the phone call and surrounding events as follows:

Q      Okay. And what did you talk about on the phone call about the picture?

**A      I don't recall. I just think it was – I don't recall. Gosh, it was -- you know, I remember getting a picture. I remember looking at it, you know. I remember saying it looked familiar, face looked familiar. At some point, whenever I got the phone call, I remember, you know, only being asked -- like, I think it was, you know, did you ever have any dealings with this person. And it was Angelo Jackson. And I said, oh,**

---

[2]      Officer Hyson explained that it was common for him to receive texts asking him to identify juveniles because, as a school resource officer, he was familiar with the student body at Watkins Mill High School. *Id.* at 27:14–28:2.

[3]      Detective Carin testified that Officer Hyson sent the pictures to him. Carin Dep. at 45:10–11; 55:14–15. The position of the pictures in the text exchange appear to confirm that.

**yes. And I recall that. And I was, like, yes, you know, here is my report. But I don't -- you know, I was, like, I remember, because I remember him so vividly from what had happened, the report and everything that happened. And that's all I remember talking about at that point. I don't recall -- I just don't remember what came first. I think -- I remember seeing a picture, I remember getting a picture. I remember, you know, like, this guy is familiar. This is familiar. It looked familiar. And yes, this is pretty much it, I think.**

Q       So is it fair to say that you felt the picture was familiar, but you didn't immediately connect the dots that it was Angelo Jackson?

**A       Correct. I didn't immediately think – I did not immediately say this is Angelo Jackson, correct.**

Q       Okay. At any point in time that night, did an officer say, do you think this is Angelo Jackson, you know, in not so many words, but did they ask you point blank, is this person Angelo Jackson?

**A       I don't recall.**

***

Q       Okay. In Detective Carin's discovery, he says that, and I am going to continue. It says: Afterwards, I sent Officer Hyson a still picture of the suspect from a surveillance video. Officer Hyson identified the suspect as Angelo Jackson. So you don't recall identifying this subject as Angelo Jackson to Detective Carin, do you?

**A       I don't recall identifying him to Detective Carin. Again, I remember -- you know, I don't. I don't recall just saying this is Angelo Jackson. I do not recall that.**

Q       Okay. So you do remember that you did not definitively say this is Angelo Jackson the night that you were contacted around 9:00 p.m.?

**A       Yes. I don't recall saying this is definitively him. I remember -- I don't recall  -- I don't recall actually, like you said, that definitive answer, I do not recall.  I did not give a definitive answer.**

Q       So you did not give Detective Carin a definitive answer regarding the identification of this photo that night?

**A       Correct.**

6

*Id.* at 37:7–40:19. Notwithstanding the testimony reproduced above, Officer Hyson also testified that he believed on the night of January 10, 2018, that the individual shown in the picture sent by Detective Carin was Mr. Jackson:

> Q:  Okay. But did you – at some point, did you believe that that was – that night, did you believe that that was Angelo Jackson?
>
> **A:  That night, did I believe it was Angelo Jackson? Yes. At some point, yes.**

*Id.* at 36:18–22.[4]

Detective Carin testified that after communicating with Officer Hyson, he spoke on the phone to Assistant State's Attorney Peter Feeney, who "indicated that he believed we had enough probable cause to go ahead and apply for an arrest warrant." Carin Dep. ay 47:3–5. Detective Carin explained that he consulted with Mr. Feeney "because it was a homicide investigation and we had to consult with the state's attorney, and we are not going to get an arrest warrant without the blessing of the state's attorney." *Id.* at 47:11–15. Detective Carin then affirmed the following, under penalty of perjury, in his Application for Statement of Charges in the District Court of Maryland for Montgomery County:

> Your affiant is Detective Michael Carin, presently assigned to the Homicide Section of the Montgomery County Department of Police.
>
> On January 10, 2017 at approximately 1518 hours, officers from the Montgomery County Police were dispatched to Westfield Shopping Center located at 11160 Veirs Mill Road Wheaton, Montgomery County, Maryland, for a report of a subject that was stabbed in the abdomen. Upon arrival, officers discovered two Hispanic male victims suffering from stab wounds. Both subjects were transported to a local hospital and later pronounced deceased.
>
> As of this writing the victims have not been positively identified. The victims will be referred to as: Victim I and Victim 2.

---

[4]  Officer Hyson recalled definitively identifying the individual in the surveillance video as Mr. Jackson when he was called in to view the video the following morning. Hyson Dep. at 41:17–44:18.

Investigators interviewed a number of witnesses to the assaults and also learned that the assaults were captured on the mall security video system. The video depicts a black male suspect armed with a knife assaulting both victims.

The suspect was identified by Montgomery County Police officers who have had prior law enforcement contacts with the suspect. The officers identified the suspect as Angelo Lamont Jackson (B/M; DOB [redacted]). Investigators obtained photograph of Angelo Lamont Jackson. That photograph matched the suspect depicted in the video.

This writer is requesting an arrest warrant be issued for two counts of First Degree Murder (Section 2-201).

All the above events occurred in Montgomery County, Maryland.

ECF No. 37-2, (the "Warrant Application").

Detective Carin confirmed during his deposition that the two identifications he referred to in the Warrant Application were Detective Lozano's and Officer Hyson's. Carin Dep. at 45:20–46:1 ("My arrest warrant is based on what Hyson said and on what Lozano said. I have no opinion. I did not identify Jackson. The identification was made by Hyson and Lozano."). He clarified further that his Application relied on the identifications of the other officers—not of his own comparison of the surveillance footage to the photos of Mr. Jackson that he testified he obtained from Officer Hyson. *Id.* at 55:8–15. He explained:"I think Angelo Jackson looks like the guy in the video, but I did not ID Angelo Jackson. Hyson identified Angelo Jackson and Lozano identified Angelo Jackson, and so they are the ones that [are] telling me it's him. I've never met Angelo Jackson, I have no prior contacts with Angelo Jackson, and the first photo I saw of Angelo Jackson was the photo that Hyson sent us." *Id*. A commissioner issued a warrant for Mr. Jackson's arrest issued based on the Warrant Application, and Mr. Jackson was arrested on January 11, 2017.

On January 26, 2017, Detective Carin testified before the grand jury regarding the Wheaton Mall stabbings. His testimony, in relevant part, was as follows:

8

Q:      And did your investigation involve identifying [the suspect]? . . . .

A:      Yes. So we reviewed the videotape and we obtained a still photo of the
        suspect. The still photo was sent to a Montgomery County police officer
        who had no idea of the incident that we were investigating and had no idea
        why we were sending him the photo. And he was able to get back to us due
        to prior police contacts and identify the suspect as Angelo Jackson, a black
        male, date of birth [redacted]. And his mug shot matches the image that's
        in the video.

Q       Was further identification also made?

A       Yes. We have a civilian witness that observed the incident and we did a
        photo array, a blind photo array, which means the detective and the person
        that's trying to do the identification don't know where the photo of the
        suspect is, and he was able to identify the suspect in that photo array.[5]

ECF No. 38-8 at 5–6.

The Grand Jury indicted Mr. Jackson for two counts of murder on January 26, 2017. ECF
No. 37-13 ("Indictment"). As the investigation continued, however, the evidence began to cast
doubt on Mr. Jackson's involvement in the January 10 homicides. Several other officers who had
prior interactions with Mr. Jackson were shown an enhanced version of the surveillance video and
either stated that they did not think it was Mr. Jackson, or that that they were not sure whether it
was him or not. Carin Dep. at 67:4–68:3. Mr. Jackson's phone records did not place him at the
mall at the time of the stabbings. Additionally, several witnesses confirmed Mr. Jackson's alibi—
that he was with local rapper Shilo Young, Shilo Young's manager, and a videographer, who were
planning to make a music video on the afternoon of January 10. Finally, DNA evidence collected
from the crime scene excluded Mr. Jackson as a suspect. ECF 37-20 (Forensic Biology Report).
Mr. Jackson was released from custody on or about March 16, 2017. *See* ECF No. 37-18 at 15
(Expert Report of Charles J. Key, Sr.).

---

5       An eyewitness had identified Mr. Jackson as the suspect in a photo array conducted on
January 24, 2017. *See* Carin Int. at 4.

Mr. Jackson filed the Complaint in this action on February 22, 2019. The Complaint alleges, in sum, that Detective Carin intentionally misrepresented the nature of Detective Lozano's and Officer Hyson's identifications of Mr. Jackson on January 10, 2017, and that he omitted relevant exculpatory information, in both his Application for an arrest warrant and in his testimony before the Grand Jury. The Complaint alleges in Count I that Detective Carin knowingly sought a warrant for Mr. Jackson's arrest without probable cause and thus unlawfully detained Mr. Jackson in violation of the Fourth Amendment to the United States Constitution.  Count II alleges that Detective Carin is liable for that alleged Fourth Amendment violation under 42 U.S.C. § 1983. ¶¶ 106–137. Count III of the Complaint states a second §1983 claim against Detective Carin, alleging that he maliciously prosecuted Mr. Jackson by initiating proceedings against Mr. Jackson "with malice or a [] primary purpose other than bringing [Mr. Jackson] to justice since [Detective Carin] knew, or should have known, that the allegations against [Mr. Jackson] were without merit." *Id.* ¶¶ 138–151. Count IV alleges that Detective Carin's conduct violated Mr. Jackson's rights under Articles 24 and 26 of the Maryland Declaration of Rights. *Id.* ¶¶ 152–160. And finally, Count V alleges that Detective Carin was grossly negligent in his investigation of Mr. Jackson and that his misrepresentation of the facts and omission of exculpatory information was the proximate cause of Mr. Jackson's "emotional distress while incarcerated, loss of reputation, and other serious injuries." *Id.* ¶ 166–67. Detective Carin filed a Motion to Dismiss the Complaint, which was denied. *See* ECF No. 17. Now, both parties seek summary judgment in their favor.

Additional facts will be provided below as needed.

## STANDARD OF REVIEW

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* In reviewing the evidence related to a motion for summary judgment, the Court considers the facts in the light most favorable to the non-moving party. *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (U.S. 2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n. 4 (1st Cir.1997)).

## ANALYSIS

Mr. Jackson asserts that Detective Carin violated his Fourth Amendment rights by unlawfully detaining him "based on reckless disregard, fabrication or concealment of evidence to obtain warrant or indictment." Compl. at 11. Mr. Jackson asserts two separate claims under 18

U.S.C. § 1983 for the alleged Fourth Amendment violations — one based on unlawful detention and the other based on malicious prosecution. *Id.* at 14–16. To prevail on those claims, Mr. Jackson must establish that Detective Carin violated his Fourth Amendment rights, and more specifically, that the warrant Detective Carin obtained for Mr. Jackson's arrest was not supported by probable cause. *See Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012) (to prevail on a malicious prosecution claim "the plaintiff must demonstrate both an unreasonable seizure and a favorable termination of the criminal proceeding flowing from the seizure."); *Manuel v. City of Joliet, Ill.*, 580 U.S. 357 (2017) (holding "that the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process").

Probable cause for an arrest "exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Dunway v. New York*, 442 U.S. 200, 208 n.9 (1979) (citations, quotation marks, and original brackets omitted). "Probable cause is determined from the totality of the circumstances known to the officer at the time of the arrest." *Brown v. Gilmore*, 278 F.3d 362, 367–68 (4th Cir. 2002). "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." *Id.*

It has long been settled by the Supreme Court that, "an indictment, 'fair upon its face,' returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause." *Durham*, 690 F.3d at 189 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 117 n.3 (1975)). However, "a grand jury's decision to indict will not shield a police officer who deliberately supplied misleading information that influenced the decision." *Id.* A plaintiff who disputes

probable cause despite the issuance of a facially valid indictment must establish that the arresting officer "deliberately or with a reckless disregard for the truth made material false statements in [the] affidavit" supporting his warrant application, or that he "omitted from that affidavit material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." *Miller v. Prince George's Cty., MD*, 475 F.3d 621, 627 (4th Cir. 2001) (citations and quotation marks omitted). Such reckless disregard is established when, considering all the evidence, "the affiant must have entertained serious doubts as to the truth of his statements or had obvious reason to doubt the accuracy of the information he reported." *Id.* (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000)). With respect to any alleged factual omissions, the plaintiff must show that "a police officer failed to inform the judicial officer" who issued the warrant "of facts that he knew would negate probable cause." *Id.* (quoting *Beauchamp v. City of Noblesville, Inc.*, 320 F.3d 733, 743 (7th Cir. 2003)). Such false statements or omissions are "material" if correcting the false statements and including the omitted facts would have defeated probable cause. *Id.*

When considering cross-motions for summary judgment, each party's motion must be considered separately with the facts construed in the light most favorable to the non-moving party. *See Rossignol v. Voorhaar*, 316 F.3d at 523. I will begin with Mr. Jackson's Motion, construing the facts in favor of Detective Carin.

## I.    Mr. Jackson's Motion for Summary Judgment

Mr. Jackson moves for partial summary judgment with respect to Counts I–IV, which are his state and federal constitutional claims, and the two 42 U.S.C. § 1983 claims that correspond

with the alleged violations of the Fourth Amendment. Mr. Jackson acknowledges that the probable cause determination is dispositive with respect to all four counts.[6]

Mr. Jackson argues that the undisputed facts of this case demonstrate that Detective Carin lacked probable cause when he sought a warrant for Mr. Jackson's arrest, and that he is entitled to judgment against Detective Carin as a matter of law. Mr. Jackson contends that Detective Carin's Warrant Application "deliberately, or with a reckless disregard for the truth, made material, false statements in an affidavit or omitted material facts with the intent to make, or with reckless disregard that it would make, [his] affidavit misleading." Pl. MSJ at 9 (citing *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 556 (4th Cir. 2017), *as amended* (Aug. 22, 2017). More specifically, Mr. Jackson argues that Detective Carin's statements that Detective Lozano and Officer Hyson identified him as the suspect in the surveillance video was "exaggerated" and "misleading," and that providing an accurate account of those identifications would negate probable cause.[7]

With respect to Officer Hyson, Mr. Jackson claims that "Hyson testified that he merely recalls viewing the photo while working a J.V. basketball game, and thinking that the photo looked familiar. Hyson was then told that the photo was Plaintiff and was asked if he had had any prior dealings with Plaintiff. Hyson sent his report along as a result. While the Defendant recalls the

---

[6]     The parties agree that Mr. Jackson's "state constitutional claims are construed *in pari materia* to his Fourth Amendment claim." Pl. Motion at 20; Def. Motion at 24.

[7]     Mr. Jackson also complains that Detective Carin's Application, and his Grand Jury testimony, stated that the photos he obtained of Mr. Jackson "matched the suspect depicted in the video," but that he "neglected to tell [the Grand Jury] that that he did not personally make this observation." Pl. MSJ at 6. Finally, he argues that Detective Carin failed to conduct a sufficient investigation and failed to apprise the Grand Jury of exculpatory information. *Id.* at 17.

conversation in a much more favorable light to himself, an examination of the text messages exchanged between Defendant and Hyson reveals no positive identification." Pl. MSJ at 10.

Based on the inconsistencies between Officer Hyson's testimony and Detective Carin's, Mr. Jackson argues that the Court "may not simply accept what may be a self-serving account" by Detective Carin when Officer Hyson's version of the events calls the timing of his identification into question. *Id.* (citing *Ingle v. Yelton*, 439 F.3d 191, 195–96 (4th Cir. 2006)). That is true as far as it goes, but it does not follow from there that the Court can simply reject Detective Carin's testimony and enter judgment for Mr. Jackson as a matter of law.

With respect to Detective Lozano, Mr. Jackson claims that he "merely suggested" that the surveillance footage "strongly resemble[d]" Mr. Jackson, but did not actually identify Mr. Jackson prior to his arrest. *Id.* at 10. Mr. Jackson also questions the validity of that supposed resemblance because at the time he made that statement, Detective Lozano had "only had a single, literally passing encounter with the Plaintiff that occurred a year before the incident." *Id.*

The record before me  contradicts Mr. Jackson's argument challenging Detective Lozano's identification. Detective Lozano was a member of a team dedicated to investigating the activity of local street gangs, including the gang known as the "Hit Squad," of which Mr. Jackson was a "validated member." Detective Lozano was familiar with Mr. Jackson from fliers that were regularly used in the course of his police work, from social media, and from music videos in which Mr. Jackson had appeared. Detective Johnston's notes from the day of the stabbing indicate that Detective Lozano "immediately knew the suspect as Angelo Jackson." ECF No. 37-7. The fact that, the day *after the warrant had issued*, Detective Lozano's more detailed statement qualified his identification by stating the suspect "strongly resembled" Angelo Jackson has no bearing on

Detective Carin's representation to the court when he authored the Warrant Application, nor does that fact that Detective Lozano later explained that he had only once seen Mr. Jackson in person.

Mr. Jackson has not identified any undisputed facts that demonstrate that the statements in Detective Carin's warrant Application were in any way false or misleading. It is undisputed that Detective Lozano had identified the suspect as Angelo Jackson at the time Detective Carin authored the warrant application. And whether Officer Hyson had, in fact, independently identified Mr. Jackson at the time Detective Carin sought the arrest warrant is a fact in dispute due to the inconsistent testimony of Officer Hyson and Detective Carin.

Furthermore, Mr. Jackson points to no facts whatsoever that indicate that Detective Carin made any statements in the Warrant Application with "reckless disregard" for the truth. *Miller*, 475 F.3d at 627. Reckless disregard is established when an officer acts "with a high degree of awareness of a statement's probable falsity" that he "entertained serious doubts as to the truth of his statements" or that he had "obvious reasons to doubt the accuracy of the information he reported." *Id.* The record is devoid of any facts that indicate that Detective Carin's acted with reckless disregard for the truth with respect to his fellow officers' identification of the suspect as Mr. Jackson. Detective Carin had no reason to doubt his colleagues identification at that time, and even if it is true that Officer Hyson did not definitively identify Mr. Jackson as the suspect on the night of January 10, Mr. Jackson points to no evidence that Detective Carin's misrepresentation was intentional.

For those reasons, Mr. Jackson's Motion for Summary Judgment is DENIED.[8]

## II.     Detective Carin's Motion for Summary Judgment

---

[8]     Mr. Jackson seeks summary judgment solely on the theory that Detective Carin lacked probable cause to seek a warrant for his arrest. He addresses qualified immunity only in the portion of his brief that opposes Detective Carin's Motion. *See* Pl. MSJ.

Detective Carin argues he is entitled to summary judgment because the undisputed facts demonstrate that he had probable cause to seek a warrant for Mr. Jackson's arrest. Even if he fails to establish that he had probable cause, Detective Carin argues that he is entitled to summary judgment under the doctrine of qualified immunity. For the reasons explained below, I agree with Detective Carin on both counts.

For the purposes of resolving Detective Carin's Motion, the relevant facts must be construed in favor of Mr. Jackson. *See Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 556 (4th Cir. 2017)*, as amended* (Aug. 22, 2017). As discussed above, the undisputed facts of this case establish that Detective Lozano identified the suspect in the surveillance footage as Mr. Jackson, and that Detective Carin relied on that identification in seeking the warrant for Mr. Jackson's arrest. *See* Section II, above. The Parties dispute whether Officer Hyson identified Mr. Jackson prior to his arrest, or whether he simply confirmed that he had had prior dealings with Mr. Jackson and sent Detective Carin the photos of Mr. Jackson he had in his file. *Id.* Mr. Jackson claims that Detective Carin's omission of certain details from the Warrant Application was a strategic maneuver because Detective Carin had "convinced himself that [Mr. Jackson] was guilty," and therefore excluded information that he "knew would negate any possible probable cause." Pl. MSJ at 12–13. Specifically, Mr. Jackson argues that Detective Carin's failure to provide the issuing commissioner with a detailed description of how Detective Lozano and Officer Hyson identified Mr. Jackson violated the Fourth Amendment because the addition of those details would have negated probable cause.

"An officer who intentionally or recklessly puts lies before a [judicial officer], or hides facts from him, violates the Constitution unless the untainted facts themselves provide probable cause." *Humbert*, 866 F.3d at 559. That said, "an investigation need not be perfect" to pass

17

constitutional muster. *Id.* "Not every mix-up in the issuance of an arrest warrant, even though it leads to the arrest of the wrong person with attendant inconvenience and humiliation, automatically constitutes a constitutional violation for which a remedy may be sought under 42 U.S.C. § 1983." *Thompson v. Prince William Cnty.*, 753 F.2d 363, 364 (4th Cir. 1985). To recover under § 1983, a plaintiff must demonstrate that the challenged warrant application was authored with deliberate or reckless disregard for the truth, and that "the false statement or omission is material, that is, necessary to the neutral and disinterested [judicial officer's] finding of probable cause." *Humbert*, 866 F. 3d at 556 (cleaned up).

For the purposes of resolving Detective Carin's Motion, I momentarily will assume that Officer Hyson did not, in fact, identify Mr. Jackson until after his arrest, and that his identification therefore should not have been included in the Warrant Application. Excising Officer Hyson's identification from the Warrant Application requires revising it to refer to a single identification by law enforcement, rather than multiple. With the offending identification removed, the Warrant Application would read as follows (additions **__underlined__** and deletions ~~**stricken through**~~):

> Your affiant is Detective Michael Carin, presently assigned to the Homicide Section of the Montgomery County Department of Police.
>
> On January 10, 2017 at approximately 1518 hours, officers from the Montgomery County Police were dispatched to Westfield Shopping Center located at 11160 Veirs Mill Road Wheaton, Montgomery County, Maryland, for a report of a subject that was stabbed in the abdomen. Upon arrival, officers discovered two Hispanic male victims suffering from stab wounds. Both subjects were transported to a local hospital and later pronounced deceased.
>
> As of this writing the victims have not been positively identified. The victims will be referred to as: Victim 1 and Victim 2.
>
> Investigators interviewed a number of witnesses to the assaults and also learned that the assaults were captured on the mall security video system. The video depicts a black male suspect armed with a knife assaulting both victims.

The suspect was identified by ~~a~~ **a** Montgomery County Police officer~~s~~ who ~~have~~ **has** had prior law enforcement contact~~s~~ with the suspect. The officer~~s~~ identified the suspect as Angelo Lamont Jackson (B/M; DOB [redacted]). Investigators obtained photograph of Angelo Lamont Jackson. That photograph matched the suspect depicted in the video.

This writer is requesting an arrest warrant be issued for two counts of First Degree Murder (Section 2-201).

All the above events occurred in Montgomery County, Maryland.

Warrant Application (alterations added).

Under the totality of the circumstances, I conclude that the alterations identified above do not negate probable cause. Probable cause is not an onerous standard—it requires only that the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . .an offense." *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004). Here, the events of the subject offense were captured on surveillance video, which Detective Carin viewed. He noted that the suspect in the video was a black male. A fellow law enforcement officer then identified the suspect in the surveillance video as Mr. Jackson based on his personal knowledge of Mr. Jackson from prior police work. Detective Carin then obtained photos of Mr. Jackson from another law enforcement officer with prior contact with Mr. Jackson, and confirmed that he resembled the individual shown in the surveillance footage. All of that information is included in the revised Warrant Application, and it is sufficient to warrant a reasonable and prudent person in believing that Mr. Jackson was the individual who committed the fatal assaults captured on the mall surveillance footage. In other words, the Warrant Application establishes probable cause even without Officer Hyson's disputed identification.[9]

---

[9]     Regarding Detective Carin's alleged omission of "context and exculpatory evidence," it is not clear to me what Detective Carin omitted that was known to him at the time he authored the

Moreover, even if I were to conclude that excising reference to multiple officer identifications *did* negate probable cause (which I do not), Detective Carin would still be shielded from liability by the doctrine of qualified immunity.

Qualified immunity ensures that police "can perform their duties free from the specter of endless and debilitating lawsuits." *Torchinsky v. Siwinski*, 942 F.2d 257, 260–61 (4th Cir. 1991). "These concerns are particularly acute when the officials are police officers investigating a crime of violence" because "police must have the ability to move quickly to solve the crime before the evidence becomes stale, a victim-witness dies, or the perpetrator has a chance to repeat the crime." *Id.* "The ability of police officers to protect the public can be severely hampered, however, if their every decision is subject to second-guessing in a lawsuit." *Id.*

"Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Ziglar v. Abassi,* 137 S. Ct. 1843, 1866-67 (2017). "To determine whether a given officer falls into either of those two categories, a court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." *Id.* "Under this formulation, a plaintiff may prove that an official has violated his rights, but an official is nonetheless entitled to qualified immunity if a reasonable person in the official's position could have failed to appreciate that his conduct would violate those rights." *Torchinsky*, 942 F.2d at 261.

---

Warrant Application—the exculpatory evidence that led to Mr. Jackson's eventual release developed after the warrant had issued and Mr. Jackson had been arrested. *See Brown v. Gilmore*, 278 F.3d 362, 367–68 (4th Cir. 2002). In any event, this Court has previously noted that "imposition of broad liability for omissions in warrant applications would paralyze law enforcement by requiring that a warrant application contain a complete, voluminous recitation of every fact known to the police which could be exculpatory, rather than a simple statement of facts establishing probable cause." *Smith v. Reddy*, 882 F. Supp. 497, 501 (D. Md. 1995), *aff'd*, 101 F.3d 351 (4th Cir. 1996).

Detective Carin's actions in this case were reasonable. He was called to the scene of a sudden and violent stabbing in a public shopping mall, much of which was captured on the mall's video surveillance system. Detective Carin and his fellow investigating officers, in effort to quickly identify the suspect, circulated images from that footage to other MCPD officers, including the street gang unit. A member of that unit immediately identified the suspect as Mr. Jackson, who was a known affiliate of a street gang, and whose image he later testified he had seen multiple times and in multiple contexts. Detective Carin was then informed that another officer, Officer Hyson, had prior dealings with Mr. Jackson. Detective Carin reached out to Officer Hyson and asked him if he recognized the image from the surveillance footage. The facts are murky with respect to the exchange that followed, but it is undisputed that after a phone call with Detective Carin, Officer Hyson sent Detective Carin photographs of Mr. Jackson from his previous encounter with him. Detective Carin believed those pictures of Mr. Jackson resembled the suspect in the surveillance footage. Based on that information, he sought a warrant for Mr. Jackson's arrest.

Under the circumstances of this case, I struggle to see how Detective Carin's actions show either incompetence or disregard for the law. To the contrary, I conclude that his actions were those of a reasonable officer working quickly to investigate a double homicide with the evidence available to him at the time. There is no dispute that Detective Carin and the officers who identified Mr. Jackson as the suspect made a mistake. And there is no question that that mistake caused significant distress to Mr. Jackson and to his family. But "the fact that a mistake was made cannot be dispositive of the issue of qualified immunity." *Gooden v. Howard Cnty., Md.*, 954 F.2d 960, 966 (4th Cir. 1992). "It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present," *Anderson v. Creighton*, 483 U.S. 635, 641 (1987), and "if reasonable mistakes were actionable, difficult questions of discretion [by law

enforcement officers] would always be resolved in favor of inaction, and effective law enforcement would be lost." *Torchinsky*, 942 F.2d at 261. And by the same token, while it is true that Detective Carin could have investigated further before seeking a warrant for Mr. Jackson's arrest, his decision to go forward with seeking an arrest warrant was a reasonable exercise of his judgment as a homicide detective for which he cannot be held liable.[10]

It is regrettable that Mr. Jackson, who was only 17 years old at the time, was falsely accused of such serious crimes, and that he was forced to spend over two months in custody as a result. That experience was undoubtedly frightening, even traumatizing, not only for Mr. Jackson, but for his family as well. But those lamentable facts alone do not suffice to establish either a Fourth Amendment violation or liability for Detective Carin.

For those reasons, Detective Carin's Motion for Summary Judgment is GRANTED with respect to Counts I–IV. And because there is no indication in the record that Detective Carin engaged in "willful and wanton misconduct" or that he "inflict[ed] injury intentionally or [was] so utterly indifferent to the rights of others that he act[ed] as if such rights did not exist," as required to constitute gross negligence, his Motion for Summary Judgment with respect to Count V is likewise GRANTED. *Wells v. State*, 642 A.2d 879, 884 (1994); *Torbit v. Baltimore City Police Dep't*, 153 A.3d 847, 856 (Md. 2017).

---

[10]     It is not clear whether Mr. Jackson also seeks relief based on Detective Carin's grand jury testimony, or whether he simply references the grand jury testimony to illustrate Detective Carin's alleged bias toward Mr. Jackson and his continuing alleged misconduct in the investigation. *See* Pl. MSJ/Opp. at 18 n. 10. But because Detective Carin's grand jury testimony was not false or misleading, the reason for its inclusion in Mr. Jackson's arguments does not matter. During his brief testimony, Detective Carin reiterated that two officers had identified Mr. Jackson, and added that Mr. Jackson had also been identified by an eyewitness to the stabbings. All of that was true. By the time Detective Carin testified before the grand jury, Officer Hyson had definitively, identified Mr. Jackson as the individual in the surveillance video, and an eyewitness to the stabbing had identified Mr. Jackson in a photo array.

**CONCLUSION**

For the reasons identified in the foregoing Memorandum Opinion, Mr. Jackson's Motion

for Summary Judgment, ECF No. 38, is DENIED, and Detective Carin's Motion for Summary

Judgment, ECF No. 37, is GRANTED. A separate Order follows.


Dated: December 19, 2022                                        _____/S/_____

                                                               Paul W. Grimm
                                                               Senior United States District Judge